We move to the next case this morning, Jennifer DiPerna v. Chicago School of Professional Psychology. Ms. Denzel? You may please the court. My name is Stephanie Denzel here on behalf of Jennifer DiPerna, plaintiff appellant in this case. Excuse me. Ms. DiPerna is asking this court to reverse Judge Dara's motion for summary judgment with respect to her breach of contract claims on the report of Ms. DiPerna for purported plagiarism and her subsequent dismissal without appeal as well as his grant for summary judgment on the issue of damages for tuition and living expenses as well as the orders granting defendants' motions in limine that followed the first summary judgment motion with respect to all evidence remaining for damages and finally the second motion for summary judgment dismissing the remainder of her claims because Ms. DiPerna was no longer able to present any evidence for damages given the prior orders. A student attending a private college or university has an entitlement not to be suspended without good cause. A breach of contract will be found where the school acted in an arbitrary and capricious manner where the student can show that there was no exercise of academic judgment or that the adverse action was taken on a rational basis. Ms. DiPerna appeals, her central argument on appeal is that there are material facts that are in dispute in this case with the precluded summary judgment, primarily whether she plagiarized and what precisely the Chicago School's policy with respect to plagiarism was, particularly when the school agreed that it relied on Turnitin.com's similarity index. Both of these facts go to whether the report of Ms. DiPerna for plagiarism and the following dismissal were without rational basis. In response to defendant's initial motion for summary judgment, Ms. DiPerna raised both of these questions. She noted that the evidence did not show that she plagiarized, there was simply the Turnitin.com report and explained in our brief here to this court all that Turnitin.com does is flag material that is similar to material found in other sources, other papers on the internet. It can make no judgment and it does purport to make no judgment. But the professor and the professor's superior went further, didn't they? They did not actually, Your Honor. Tell me what they did then. What's your representation as to what the record shows that both of them did when they got the report? Sure. Dr. Davison agreed in her deposition that she did no independent investigation. She simply accepted the Turnitin.com report's similarity index as evidence that Mr. Perna had plagiarized 92% of a particular section, conclusively plagiarized without attribution or appropriate attribution. She didn't look at the sources that Turnitin.com raised. She did not go and look at the sources that Ms. DiPerna cited. She then reported it to Dr. Mudd and several other faculty. Dr. Mudd claimed to have done some independent investigation, but he was unable to specify what he looked at, when he looked at it, how he looked at it. In short, was able to produce no evidence, even through his own testimony. Well, his evidence, he said he did, but his testimony was not very specific. Is that a better way of putting it? That is correct. All he did was assert that he did, and there's nothing. He was unable to present anything that really supported that with respect to any detail. And the charges presented to the Student Affairs Committee was that she conclusively plagiarized that section. Now, of course, we have a special situation here, do we not? We have a, only, there's really only one part of your client's report that's really at issue, and that is the part that really sets forth the professional model of analysis, if you want, for the paper. That's correct. So, shouldn't we just focus on that? I mean, the professor felt that area, where there was a 90% rate, that area clearly had been lifted. That's what we focus on, right? So I think that there's evidence that that is not actually what the Chicago School's policy and practice was to focus on. In fact, when Dr. Davison forwarded just that section on to Dr. Mudd, he instructed her to please run the entire paper through Turnitin.com to comply with protocol, because only a few pages skewed the results and the number that came out. But I would also point out that that raises some of the other questions and arguments that we made, that Dr. Davison's explanation of why she suspected plagiarism and why she referred Ms. DiPerna could be found by a jury to show that there was no rational basis. She said that she suspected plagiarism in that section because Ms. DiPerna used citations there when she did not use citations in other sections, and that her writing style was different. But Dr. Davison also said that is the one section in the paper that students are expected to cite. So essentially, Ms. DiPerna did precisely what Dr. Davison expected students to do, and she therefore suspected plagiarism. Similarly, that's the one academic section, whereas the rest of the paper is about the student's clinical experience and internship and is more personal in voice. So one would expect the writing styles to differ between the two. Again, Dr. Davison's explanation for report is that she suspected plagiarism because Ms. DiPerna did exactly what she said students ought to have done. And that's sufficient for a jury to conclude that between that and the absolute lack of independent investigation that Dr. Davison did, given that Dr. Davison admitted in her deposition that she was aware of Turnitin.com's similarity index, was not plagiarism. It couldn't flag or judge citation. That that's evidence the jury could. What was the comparative document that came up on Turnitin.com? Do we know what that document was? What was in the record is the report from Turnitin.com that lists 92% at the top and a list of sources with a percentage next to it. Is that a common test? Turnitin.com? Yeah. I don't know that I can speak on that generally. I think that it's used in other universities. Certainly other professors in the Chicago School have used it. Dr. Davison had not for quite some time. She didn't even have a login for it. So she pulled it out especially for Ms. DiPerna. But it's clear, and defendants actually even agree in their briefs and motions in the record, that Turnitin.com, you can't just take that number, declare plagiarism, and pass it on. That that's really not what the program is used for. It simply flags text that you base on other material, which you expect in academics that there's going to be citation or reference to other ideas. What does that mean? When you see that report where there's a 92% test, is that only for you to look, warn you to look further? To now check it out and see? Is that just a warning or is that a conclusion? I think at best it's a warning. It's certainly not a conclusion. What it indicates is that section relied heavily on the research of the ideas of others, which is entirely appropriate if one cites. And Mr. Perna included some citations. And Turnitin.com can't actually distinguish. It doesn't evaluate whether the citations she included were correct. It simply says there's some similar material in this source over here. And so without doing that investigation, that further evaluation, one can't conclude anything from the number. Okay, well, I don't know anything about this. But when you talk about something that's original, that would be confined to what a person experiences and some other things, as opposed to reference to experts somewhere else. That's where you learn from them. And I guess that would imply that somebody copied something word for word, as opposed to analyzing it and debating it and kicking it around a little bit, and I don't know, whatever it is. What was the other ultimate conclusion of this 10%? The 10% is the result after running the entire paper through. And, again, it has the same meaning or lack thereof as the 92% with respect to a plagiarism conclusion. And, in fact, I think that the report for the entire paper makes clear what Turnitin.com can't do. It flagged the title, the running title of her paper as plagiarized. It flagged is 17 years old as a plagiarized phrase. It flagged the Chicago school as a plagiarized phrase, or at least as a similar phrase. And so I think those examples make clear that you can accept a simple flag by Turnitin.com as evidence of plagiarism. It's going to flag as defendant's own witnesses agreed. Similar phrasing, phrasing that you can't say any other way, much like legal four, five, six-factor tests. There are only so many ways that one can say that. One is not stealing somebody's idea to list the same six words in a row. In many cases, if there's a citation there, that's sufficient. Whether there need to be quotes or not may be debatable, but the point is that Turnitin.com as a program can't make those judgments, can't make those decisions. And so in relying on it without any further investigation, that's an absolute abdication of any academic judgment, which is by definition arbitrary and capricious under the standard. I think it also is important that what the policy of the Chicago school is with respect to plagiarism is disputed. Defendants here assert that any amount of plagiarism, by which they seem to mean any similarity index on Turnitin.com over zero, any matching text, is conclusive evidence of plagiarism. The problem is that their witnesses testified that that's not actually accurate at all. Nonetheless, the Chicago school agrees that they rely on the Turnitin.com similarity index in making their determinations of plagiarism, which raises the question of what is that threshold? What number is a problem? If it's not one or anything over zero, when do we hit a concern? What number is higher? How was this Turnitin.com selected as sort of the determination of what's been plagiarized or not? That's not in the record, Your Honor. I'm sorry. I don't know. They just use it. They have agreed that they use it, and that is at least the basis that they use for misdemeanor. Certainly it was used in, I believe, Dr. Perez's class. It's noted in the diversity seminar syllabus, which notably is provided and drafted by the program, not by a specific professor. With respect to that syllabus, that syllabus is one that very clearly outlines the threshold. Similarity index of 20% for the whole paper is when you get referred for plagiarism, and that policy is side-by-side with the academic dishonesty policy of the school. So it's a reasonable assumption that those are not in conflict, that those complement each other. So when the school is employing Turnitin.com as a basis for plagiarism referrals, 20% is that threshold. Well, what was the ultimate 10% thing? Was it based on something else? It was her whole paper. So the 92% is based on a single section. I think it was approximately a page and a half, the section where the students were required to review the research or the academic theories in the field that they were using as a counseling approach. And then the 10% was the entirety of the paper. So when you put all 20-some-odd pages in, I don't recall the exact number. And at the whole paper level, it only attributed 1% or less to each individual source. I think there were more than 20 sources. It noted some IP addresses. I mean, it wasn't even clear that they were actual sources. But there is testimony in the record by defendant's witnesses that it's very common for any student paper to come up with results like that,  And again, they may very well have cited properly. They may have cited inappropriately. They may have cited to a different source, nonetheless appropriately, but one that Turnitin didn't select. So Mr. Perna's evidence with respect to what the policy is, is really the only evidence in the record when it becomes clear that any similar text is not the policy, that any Turnitin.com index over zero is an automatically plagiarism. Is there some possibility in there that she was treated differently than others who might have gotten a similar score? Mr. Perna makes that assertion, and I think the evidence that she presents in this record with respect to that are focused on the school's general policy. So she has Dr. Torres Rivera, who had been a department chair, had told her that 20% was the threshold. Dr. Perez, who's a professor in the department, testified that 20% was the threshold. So Mr. Perna believes that she was treated differently, but the evidence that she presents is centered around the policy. Does every student's presentation run through this? Or does it only have to be some kind of suspicion before you do that test? Not you, but the school? So I don't know what the answer is with respect to Dr. Davison, other than we know that she didn't run any other student's paper through the program. She hadn't used it in so long that she no longer had a password. She had to go get a password, especially from IT, to utilize it, and that all she offered with respect to suspicions is that Mr. Perna did cite in that section and that her sort of writing style in the academic section differed from that in the clinical and personal sections. It was based on Dr. Davison's thought the writing style looked different. That is correct. That and the fact that she cited there where she discussed some of the ideas much more loosely later and didn't cite. But in the context of how Dr. Davison described the requirements of the paper, Mr. Perna did precisely what Dr. Davison said students should be doing. And so the jury could easily conclude from that that the proper reason for a report to the disciplinary committee was not an appropriate basis. It was not plagiarism, that she was, in fact, targeted. So our argument is that these material facts preclude summary judgment. At the very least, they entitle Mr. Perna to proceed to trial. Because of the evidence in the record, there's sufficient evidence for a jury to conclude that she did not plagiarize, that she was not referred because she violated the policy. In fact, she was referred despite the fact that she conclusively didn't violate the policy because, again, any disputes must be resolved in her favor. And that that would be sufficient to show that these actions were without rational basis and that they were a breach of contract. Similarly, she was reported to the Student Affairs Committee for plagiarism with a statement that she conclusively plagiarized based on the Turnitin.com report. She was dismissed without further explanation. And then she appealed the decision. So she, during her appeal, discussed Dr. Davison's targeting of her, the fact that she was singled out for entering her paper into Turnitin.com, that Dr. Davison had not followed protocol in that respect. She hand-typed a section in. She had to be instructed to do the entire paper, and then she referred her despite the fact that she didn't meet the threshold, as well as pointed out some other irregularities with respect to the Student Affairs Committee, evidence that they weren't willing to acknowledge or take under consideration, as well as, as defendants pointed out, the number of professors or faculty on the Student Affairs Committee. The policy for the Chicago School requires that students be notified of who will be sitting on their committee in advance. Ms. DiPerna was notified, and the ultimate committee differed from the people that she was given. Why was she targeted? I'm sorry? What was the reason she was targeted, at least that she thought she was targeted? Her position is that she was targeted because of the lawsuit. She had filed a lawsuit prior to these sequence of events for an earlier incident with respect to bullying, harassment, and a referral to a disciplinary committee on the basis of, improperly on the basis of race. So that was a pending lawsuit at the time that these events occurred. It was a lawsuit that Dr. Davison was aware of. Certainly that Dr. Mudd and the other faculty were aware of because they were intimately involved in the original incidents that spurred the lawsuit. To be clear, Dr. Davison was not involved in the original incidents that spurred the lawsuit, as far as I can tell, but the remaining faculty were involved, and Dr. Davison testified that she was aware of the suit, she'd been told. Would you like to speak a little bit to the other point that you made in your brief with respect to the additional expenses because of the problem of, the earlier problem she had with respect to the Instagram? Sure. Judge Dura had dismissed her claims for tuition and living expenses, finding that she waived her claims related to the academic development plan and delay of internship. I note first that those were not the grounds on which defendants sought summary judgment. They solely sought summary judgment on damages because her mother paid for everything, which isn't actually accurate. She testified in her deposition that she took out student loans, which would be, of course, her obligation for some of those expenses. So we contend, as a first point, that Judge Dura really was not proper to grant summary judgment on grounds not raised by defendant. Nonetheless, Mr. Perna did not concede those claims. What she conceded was that the academic development plan, after it was selected as a sanction, wasn't developed properly according to policy. That's an independent claim from whether she ever should have been referred or sanctioned for the Instagram posting in the first place. That's the same with the delay of internship. She continues to challenge that she should never have been referred or sanctioned for the Instagram posting. And if she'd never been referred or sanctioned, she wouldn't have had any delay in her education. She wouldn't have had any additional expenses. And so the fact that she conceded that the sanctions as chosen, that she can't challenge whether those sanctions were implemented appropriately, doesn't mean that she doesn't still have a claim for damages. I'm getting quite close to the end of my time. If the Court doesn't have any questions, I'd like to reserve. Thank you, Counsel. May it please the Court, good morning, Counsel. My name is Elisa Arnoff, and I represent the Chicago School of Professional Psychology. And I'm going to change my argument a bit. I want to respond to what Counsel has said. And this case is really about quotation marks. There was a case in the news recently about a comma. This case is about quotation marks and what the plagiarism policy of the Chicago School is. And Counsel didn't share that with you. It's in Judge Dara's decision. Plagiarism is intentionally or unintentionally representing words, ideas, or data. It goes on. Examples of plagiarism include but are not limited to copying the work of another verbatim without using quotation marks. Also, it says further, further a single example of failing to use quotation marks appropriately may be considered plagiarism. So that's the school policy, and that's our starting point for where we are today. So Mr. Perner was a student in the Masters of Clinical Psychology program. She wanted to be a therapist. And when you attend graduate school, you have certain obligations to meet. There are academic standards that you have to meet. And the school has obligations, too, but with all due respect, it's not the obligation that Counsel outlined. I'm aware of no case law that's been cited, either the district court or here, that a student cannot be suspended without good cause. We're in a private setting here. We're not talking about misconduct. We're talking about academic discipline. And what the Supreme Court has said twice is with respect to discipline based on an academic matter, the court has to determine as to whether the decision was made in an arbitrary, capricious, or bad faith manner. Those were constitutional cases, though, weren't they? They were. And we're dealing here with state law, right? Correct. What's the state standard? We don't have a state statute. We've got the cases. You have a state standard? State standard, yes. And rates in Hollard use the arbitrary, capricious, and bad faith standard. And that's standard used in a lot of jurisdictions in the United States, right? It is. It is. It's a common law standard in academic matters. Right, for arbitrary, capricious. Yes, Your Honor. So I can't speak to the suspension without good cause because it doesn't go to the standard that we have here. You have to look as to whether the decision goes beyond the pale of reasoned academic decision making, and that's the United States Supreme Court as well. There again, though, we're dealing with state law here. Right, and that's what the state's rates, which is one of the state cases, actually cites the Supreme Court in New York. And that's a case that other counsel in this case has cited as well. So I think that until what I just heard my argument was going to be, I don't think there's any disagreement as to what the standard is because that's the standard. Well, there are two different kinds of problems is my point. Right. And one can argue that the state standard stands on very, very different grounds and the reason for it is very different. No, I think the state, and I want to make sure that I'm not confusing what you mean by state. I mean there may be a different standard for public schools, if that's what we're talking about by state, and for private schools. The state cases looking at private schools have used the Ewing standard. That's right. Okay. As a state law choice. Correct, as a state law choice here in Illinois. That's what I'm trying to make sure we're on the same page. Right, and even though Mr. Perna is a resident of Ohio, we've never had a dispute. About choice of law. Illinois law, right. And before I get to the record, one of the other things that I want to mention is I think what's really important is this is a case about what's a reasonable inference because when I look at the arguments that Mr. Perna's counsel has made throughout the case, she's talking about every conceivable inference that could be made with a lot of speculation involved, and that's not the standard of summary judgment. So the first thing that I want to talk about is whether Judge Darrow was correct in finding that the decision to dismiss Mr. Perna for plagiarism was not made in an arbitrary, capricious, or bad faith fashion. And one of the things, counsel referred twice to the specific charge that went to the Student Affairs Committee, and we call it the SAC for short, if you hear me say that, and that in that SAC referral it said that plaintiff conclusively plagiarized. That referral is nowhere in the record before you. So there's absolutely nothing in the record that says that the SAC referral said she conclusively plagiarized. And, again, this is a summary judgment. This particular matter is on summary judgment. With respect to the policy, again, counsel talked about citations. And, yes, in this 92%, there were some citations to authors. But when you look at it, you see that there are absolutely no quotation marks. So Dr. Davidson said her writing style looked different. Well, sure it looked different. She didn't attribute. There were no quotation marks there. It looked different. It didn't look like her writing. She didn't run it through, turn it in right away. And let's remember, Dr. Davidson is an adjunct, and I think that's important to the extent that she only knew about Mr. Perner's lawsuit generally. She was not a regular professor at the school. But the first thing she did is she just went and she ran things through Google, and she saw things that came up. That's when she went to the school. She asked for a Turnitin password. She hadn't used it in some time. When you say she ran things through Google, could you be a little bit more explicit as to what she did? Sure. Google is one of the search engines, and I'm not an Internet whiz, but Google is the one that I use. And what she did is she took, let's say the sentence said, the lazy brown fox jumped over the brown dog. She typed that in, and the language came up with the site, the exact language. So at that point, she went to do something more formal, and she went to get the Turnitin password. And she got the Turnitin password. There are people at the school that use Turnitin. It happens to be in Dr. Perez's diversity class, at least in the one that Mr. Perner took, that syllabus says if you're using a paper and you're using references, you, the student, must use Turnitin first before you submit it to me, the professor. That's completely different from anything that we've heard about Dr. Davidson's syllabus. So Turnitin has been used by the school. Dr. Mudd testified to that as well. She got her Turnitin. From my understanding, generally they're required to use that before they turn the paper in? It depends on the class. So specifically in the diversity syllabus, which was Dr. Perez's syllabus, where it talks about it's an automatic referral if there's a 20% similarity index. If you read that paragraph, it says if you, the student, are using any references, you must use Turnitin and submit me the paper. You can submit the paper through Turnitin as many times as you want, but I'm going to consider the first thing you send me your original work. And if what you give me comes to a similarity index of at least 20%, it's an automatic referral to the SAC. So she's talking about that specific program. But what's also important, Dr. Perez specifically testified that that's not the policy of the school. She said you look at the similarity index and you always have to look at context. And Dr. Davidson said that, and Dr. Mutz said that. And that's where this 92% comes in. And I think we have an understanding. This paper that we're talking about is the clinical competency exam, and I think, as a judge, you had said everything else is about your experience with the client, and then you've got this one section, the case conceptualization section, where you applied the theories. And that's where the 92% came in, and that was the concern, not the 10%, because most of the rest of the paper was the student's reflection and the student's reporting on what she learned from her client and the client's family. So I don't see that as an issue. And I don't see anything suspicious or wrong with Dr. Mutz saying, now run the whole paper through turnitin.com. I think that's good practice. I mean, let's look at the whole paper. Did that cost you anything? I don't know. I believe the school probably pays, you know, because it is a software program. I mean, I know that I just can't go on my computer and bring up Turnitin because I don't have access to it because I've not purchased that software. So that's my guess. So if you were to go back and run my brief through Turnitin, I don't think you could access it unless the court has the software. Well, I guess it's wrong. Because, for example, that may be why Dr. Davidson used Google first, because that was a free service. Yeah, that might make sense. And so she couldn't go on the Turnitin if she didn't have access to it. Yeah, because she's an adjunct? It could be that. I don't know. But, again, I don't think there's any nefarious in Dr. Mutz saying run the entire thing through. Dr. Mutz said he did do some independent verification. So he may not have remembered. You know, this was a long time ago. This was in 2015. He was deposed in 2016 or 2017. But he remembers doing it. And remember, it's a mandated referral in the handbook for plagiarism, and that's not been disputed. They admitted, our statement of material fact, that it's an automatic referral. Well, that's a pretty serious charge, though, in any academic setting. It's a very serious charge. So it seems to jump up more than whatever else goes on. Right, because, you know, it's integrity. It's academic dishonesty. And the school policy is strict. I mean, I'll admit that. I mean, it says, you know, plagiarism is intentional or unintentional. And it talks about the quotation marks. But I don't think it was the project of DARA, the province of Judge DARA, or this court, or plaintiff's expert, to say, you know, the words of the expert, this is an impossibly strict policy. This is the school's policy, and that's not being changed. I mean, that's not being attacked here. There's nothing in the handbook that talks about a percentage. We look at what Turnitin comes back with, and you look at context, and the referral was made. Plaintiff's counsel did not depose anybody sitting on the SAC. So there is nothing in the record that plaintiff can show was discussed, was discussed improperly, that they didn't discuss context, and that was their choice. But without that, they can't raise an issue of material fact as to whether the decision was arbitrary, capricious, and made in bad faith. She hasn't even submitted the dismissal letter. She quotes to it at one point, but it talks about her being dismissed for academic dishonesty, which is the plagiarism. And I think all this about the Turnitin Similarity Index, I mean, it's a smokescreen. This is the standard the school used. They looked at context. Mr. Perna went to the SAC hearing. She admits that she was there. She admits that she had the opportunity to present, and she was dismissed. Another argument that plaintiff has made, and it's not been addressed here, but it's in the brief and I want to make sure we address it, is what I call the plagiarism plus argument. She's saying that even if Judge Jarrett was right on the plagiarism, that there wasn't a genuine issue of material fact, there's a genuine issue of material fact as to whether they considered my prior discipline, my ADP and my internship delay, in rendering this decision. So I call it plagiarism plus decision. But all she's doing is speculating. Again, there's no evidence that the SAC discussed what happened prior. She's speculating. So this plagiarism plus argument, I think we drop that. That means that she wasn't raised to profile. Correct. Yes. Yes. I mean, the lawsuit was filed after the ADP and the internship delay were imposed, and Ms. DiPerna continued on in school. And after the dismissal, then she amended her lawsuit. So she's claiming then that she was kind of singled out from this point of view. Correct. And then this is another thing to plagiarize. The straw that broke the camel's back or something like that. Right. And again. I won't put that in quotes. That's okay. I've been trying not to use air quotes here when I talk about some of this. Again, that's what's important is because we have nothing in the record whatsoever that suggests that any member of the SAC had knowledge of the lawsuit. Dr. Mudd wasn't on the SAC. Dr. Perez wasn't on the SAC. Dr. Quinones wasn't on the SAC. Dr. Davidson wasn't on the SAC. So we don't even know if they had any knowledge of the lawsuit. And again, is it a conceivable inference that they did? Sure. But is it a reasonable inference? No, it's not. So I think that knocks out the plagiarism plus. If I may, I'd like you to ask counsel about the damages for the ADP and the internship delay, and if I could address that a little bit. I think that's important. We don't see how you can separate the referral to the SAC, what I'm going to call the first referral to the SAC for the Instagram post, from the discipline. I think that's irreconcilable. So when Mr. Back, DePerna's counsel, withdrew anything relating to the ADP and withdrew anything relating to the internship delay, everything was gone. That's where any potential damages came from the extra year of school, which was for the internship delay. That's out. There are no other damages available to plaintiff with respect to this referral to the SAC, the internship delay, or the ADP. Is there a group decision to refer it to the SAC? The way that it generally works, and I do believe that Dr. Mudd has explained that I can't promise that it's in there, but it's generally a department decision. The department discusses it. And then for certain things, there's a mandated referral. But, for example, Dr. Davidson could not have made the SAC referral. She's required to talk to the head of the department. The department has the discussion. Because she's an adjunct? Not even because she's an adjunct. So even if, I'll give you, let's say it was even Dr. Perez, for example, who wanted to make an SAC referral, Dr. Perez still would have to go to the department chair and have a discussion. So the professor in the specific class does not have the power to move it along that way. They have to go to the next step in the process. See, no one in the SAC was deposed. How does one become a member of the SAC? By luck, I guess. Good or bad. I've got my in-house counsel here. We may have people volunteer. We may shoulder tap people. But there's different people. And generally, obviously, if you've got any involvement in the matter, you're off. So, you know, generally there's not somebody from the department, you know, for your own department, sitting on the S, and that's in the materials. So this is a fluid group then? It's not a set group of people? It's set, like I believe, and, again, it's not on the record. I'm sharing with you what I know for representing them. Usually they may sit for two-year terms. Some people stay longer. So, again, I can't tell you when this specific group started, but I can tell you there's nothing in the record that they had any knowledge of the lawsuit. But they make the decision, right? They make the decision, yes. Yes. I've got less than two minutes left.  So, again, generally, Your Honors, we would ask that you affirm all the decisions made by Judge Dara and Judge Lee, and I thank you for your time this morning. Thank you, Counsel. I have some limited time, so I'm just going to make a couple of very quick points. I'll give you another minute. Okay. Thank you very much. With respect to the right not to be dismissed without good cause, that actually comes from a Seventh Circuit case, Williams v. Wendler, which we cited, which itself cited an Illinois case between a student and a private college. And it very much noted that that was based in the contractual relationship. So it was not related to, say, a constitutional issue. I'd also like to address the statement that this is about a single example of failing to use quotation marks. I'll note that that's the first that we've heard, that quotation marks plays a role in this. That was not something raised in the record or prior. But I'll also note that the syllabus for the two classes that the Chicago School presents itself leaves off quotation marks when it quotes the APA Code of Ethics. There's a single quotation mark missing. So if that is indeed the Chicago School's policy, then they're permitting plagiarism in their syllabuses. I suspect that that's not actually their policy. Council also noted that Dr. Davison ran some sentences, what exactly, through Google. There's no evidence of what she found. She didn't indicate that there were, say, exact quotations from other locations prior to going to turnitin.com. So we don't believe that that contravenes what Ms. DiPerna has presented. And we do have testimony with respect to the referral and what was said during the hearing from Ms. DiPerna herself as she was given notice of the referral and involved, of course, in the hearing. And lastly, I think Council confuses here again the similarity index with plagiarism and proceeds in her argument under the assumption that Ms. DiPerna did conclusively plagiarize, which we argue is disputed very much here. If there are no further questions, we ask you to reverse. Thank you, Council. Thank you. Thanks to both Council on the cases taken under advisement.